NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-1190

LHPNJ LLC

vs.

JEFFERSON DEVELOPMENT PARTNERS LLC & another.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

This appeal stems from a tax lien foreclosure initially brought by the city of Taunton (city) against Jefferson Development Partners LLC (Jefferson), the owner of approximately forty-two acres on which an historic textile mill known as the Whittenton Mill once operated (the property).[2] As we discuss in more detail below, Jefferson failed to pay its property taxes and various municipal charges including approximately one-half

_____

[1] The Attorney General, intervener.

[2] The property at issue is comprised of two parcels: a small parcel on which there are no buildings (38-107) and a large forty-two acre parcel on which there are many buildings (38-137). This appeal primarily concerns the tax lien on the larger parcel. For ease of reference, we refer to both parcels as "the property."

of one million dollars it owed the city for fire safety remediation services known as "fire watches." As a result, in August 2015, the city took tax title to the property and later initiated proceedings in the Land Court to foreclose the owner's right to redeem the property. Whittenton Holdings (Whittenton), the holder of a first mortgage on the property, filed an objection and defense to the city's tax lien petition. However, before an amount for redemption was settled, the city conducted a tax title auction. LHPNJ LLC (LHPNJ), a limited liability company incorporated for the purpose of purchasing the property, was the successful bidder and on October 25, 2017, the city assigned LHPNJ its tax title to the property. LHPNJ subsequently was substituted for the city as the plaintiff. During the ensuing years of litigation, a judge of the Land Court issued several decisions culminating in an order from which the parties cross-appealed.

For the reasons discussed below, we affirm the substance of the order but conclude that it must be vacated, and the case remanded, for a determination regarding the applicability of the United States Supreme Court's recent decision in Tyler v. Hennepin County, 598 U.S. 631 (2023), and recent amendments to G. L. c. 60. See St. 2024, c. 140, §§ 80-99, 250.

Background. We begin with an overview of the procedural and factual background, and reserve specific facts for our

2

discussion of the issues. The property contains several interconnected buildings which, by 2011, had fallen into disrepair. Despite their poor condition, some of the buildings had tenants. Due to the lack of functioning fire alarm and suppression systems, the city's fire department ordered a fire watch pursuant to G. L. c. 148, § 5, beginning in December 2011. That fire watch, and subsequent ones, required the fire department to provide an onsite presence at various times during a four-year period. Jefferson's owner, David Murphy, agreed that the fire watches were necessary under the circumstances and, although he agreed to pay for them and did pay for some of the charges, at the time the city took tax title, he owed the city about one-half of one million dollars in fire watch charges.

After the city took tax title to the property in August 2015, it created a tax title account which included, among other things, missed tax payments, accrued interest, and the fire watch charges. About a year later, in April 2016, the city filed a petition pursuant to G. L. c. 60, § 65, seeking to foreclose all rights to redeem the property.

Whittenton received notice of the foreclosure action pursuant to G. L. c. 60, § 66, and filed an objection on April 19, 2017, challenging, among other things, the inclusion of the

3

fire watch charges in the redemption amount.[3] As we have noted, before any of these issues were addressed, the city held a tax title auction and LHPNJ was the successful bidder. LHPNJ paid the city all overdue taxes, applicable interest and unpaid municipal charges, including approximately $459,000 that the city claimed represented its fire watch expenses.[4] After LHPNJ was substituted as plaintiff in place of the city, it filed a motion requesting an entry of finding under G. L. c. 60, § 68, of the amount the owner or a person claiming an interest must pay to redeem the property. Whittenton filed additional objections, and the parties filed cross motions for summary judgment. Following a hearing, the motions were denied. As relevant here, the judge concluded that the record contained sufficient evidence to defeat Whittenton's claims that (1) the city had no authority to impose the fire watches under G. L. c. 148, § 5; (2) the fire watch charges were unreasonable or disproportionate and therefore were unconstitutional; (3) LHPNJ was estopped from collecting the charges as a result of the city not informing Whittenton's predecessor of them; and (4) the tax

---

[3] The amount of the lien for fire watch expenses may be challenged by a party with an interest in the property at a right of redemption proceeding in accordance with G. L. c. 60, §§ 65, 68, and related provisions.

[4] Specifically, LHPNJ paid $1,236,631.37 for parcel 38-137, and $6,996.02 for parcel 38-107.

4

title auction was unlawful. With regard to LHPNJ's cross motion for summary judgment, which asserted that neither Jefferson nor Whittenton could challenge the fire watch liens because they failed to exhaust their administrative remedies, the judge stated that there was a substantial question "whether anyone has the right to contest charges arising under [G. L.] c. 148, § 5, and if not, whether [the statute] comports with federal and state notions of due process." Based on the suggestion that the statute might be unconstitutional, the Attorney General intervened in the case.[5]

Following a period in which the parties unsuccessfully attempted to settle their disputes, a new round of motions and cross motions for summary judgment were filed. In a comprehensive order entered on March 17, 2021, the judge entered summary judgment in favor of LHPNJ on Whittenton's claim that the tax title auction and subsequent assignment to LHPNJ was unlawful and denied LHPNJ's motion for summary judgment on its claim that the fire watch liens were valid. As to the latter claim, the judge concluded that genuine issues of material fact existed as to the perfection of the fire watch liens and ordered a trial on that issue. The judge declined to address the constitutional issues until after trial.

---

[5] We acknowledge the amicus brief filed by the Attorney General.

A one-day trial was conducted on September 16, 2021, at which the city's fire chief Timothy Bradshaw, fire inspector and captain Robert Bastis, and treasurer/collector Barbara Auger; and the property owner, David Murphy, testified. The judge then issued an order containing detailed findings of fact and conclusions of law on October 18, 2021. The judge found that the fire department had conducted five separate fire watches between 2011 and 2015 -- and not two watches as LHPNJ alleged before trial or one continuous watch as LHPNJ alleged at trial. The judge further found that the city perfected its lien with respect to only two of those five watches. Ultimately, the judge found that the amount of the perfected liens corresponding to the fire watch charges was $88,349.59, far less than the $458,646.77 that LHPNJ claimed Jefferson was required to pay to LHPNJ to redeem its title.

Following the trial, the judge returned to the question whether Whittenton had been deprived of due process. The judge declined to rule on the question whether G. L. c. 148, § 5, was unconstitutional on its face, but determined that the statute, as applied in the present circumstances, did not violate Whittenton's right to due process. In an order dated December 20, 2021, the judge explained that because Jefferson was aware of, consented to, and agreed to pay for the fire watches, it waived any right to further process. The judge further reasoned

6

that Whittenton, as Jefferson's mortgagee, had no separate independent due process rights.

Having resolved all disputes between the parties, the judge then held an evidentiary hearing to determine the amount needed to be paid to redeem the property and avoid a judgment of foreclosure. On April 19, 2023, the judge entered an interlocutory order titled "Order on Motion for Entry of Finding." Among other things, the order affirmed the exclusion of most of the fire watch charges in the final redemption amount.[6]

LHPNJ then filed a petition for relief from the order pursuant to G. L. c. 231, § 118, which was denied by a single justice of this court. However, the single justice also determined that the "issues involved in this matter have sufficient gravity that they should not be decided by a single justice, but by a full panel of this court. . . . I grant leave to the plaintiff LHPNJ, LLC to file an interlocutory appeal from the judge's [April 19, 2023] order, and for the defendant

---

[6] The redemption amount for parcel 38-107 was $6,996.02 in principal and interest as of November 8, 2017; and $673,666.07 in principal and interest for parcel 38-137.

7

Whittenton Holdings, LLC to file an interlocutory cross-appeal."[7] These appeals are now before us.

Discussion. 1. LHPNJ's appeal. LHPNJ argues that the judge erred by characterizing the fire watch as five separate events and for faulting the city for not following certain statutory requirements in connection with each separate watch. LHPNJ further argues that, even if there were technical irregularities in imposing the fire watches, they were neither substantial nor misleading and, therefore, pursuant to G. L. c. 60, § 37 (which we discuss below), the charges are valid. Lastly, LHPNJ asserts that, in any event, public policy considerations support the validity of all of the fire watch charges.

First, the judge's finding that there were multiple fire watches and not two fire watches (or one continuous watch) is amply supported by the record.[8] "When reviewing the trial judge's decision, we accept his findings of fact as true unless they are clearly erroneous." Andover Hous. Auth. v. Shkolnik, 443 Mass. 300, 306 (2005). See Mass. R. Civ. P. 52 (a), as

---

[7] Although Jefferson has filed a brief, it appears that the single justice granted Whittenton leave to notice an interlocutory cross appeal, not Jefferson.

[8] In light of our conclusion, we need not address Whittenton's argument that LHPNJ is estopped from asserting that there was one continuous fire watch rather than two as it had alleged before trial.

amended, 423 Mass. 1402 (1996).  While it is true, as LHPNJ

asserts, that the judge found Murphy, on behalf of Jefferson,

agreed to the charges, that fact does not detract from the

evidence that the watches were separate events that began and

ended on specific dates for "distinct reasons."[9]  Notably, the

judge found that while each fire watch began because the

property's alarm and sprinkler systems were not working, the

first three watches ended when Jefferson repaired the systems,

the fourth watch ended when Jefferson hired a private firm to

perform fire watch duties, and the fifth watch ended once most

of the tenants had departed.  In making these findings, the

---

[9] The judge found that the first watch (2011 watch) began on December 19, 2011, because the mill's alarm and fire-suppression systems weren't functioning safely and because the mill had tenants.  The fire department ended the 2011 watch on January 3, 2012, because Jefferson had repaired its alarm and fire-suppression systems.  A second fire watch (early 2012 watch) began on January 13, 2012, and ended on February 15, 2012.  The fire department imposed this watch after it became clear the repairs from the 2011 watch didn't hold.  The fire department ended the early 2012 watch once it was satisfied that Jefferson had repaired its alarm and fire-suppression systems.  Then, a third fire watch (late 2012 watch) began December 5, 2012, and ended December 16, 2012.  The fire department imposed this watch after the property's alarm and fire-suppression systems malfunctioned again.  A fourth fire watch (fourth watch) began January 4, 2013, and ended March 27, 2014, when Jefferson hired a private firm to conduct protective services.  By this time, Jefferson had filed for bankruptcy, and the services of the private firm ended abruptly when the bankruptcy court permitted the trustee to abandon the property on June 19, 2015.  Thus, another fire watch (fifth watch) began on that day and ended on September 8, 2025, at which time Jefferson agreed to end all use of the mill by tenants other than in one heated building, and to install entry (burglar) alarms.

judge relied on the testimony of the fire chief and fire captain which was supported by documentary evidence and stipulations by the parties.[10]  In short, while we acknowledge, as LHPNJ asserts, that the fire safety issues were not completely resolved until Jefferson agreed to restrict tenants to one building, there is no basis for disturbing the judge's finding that there were five separate fire watches.

Next, we are not persuaded, as LHPNJ asserts, that even if there were five separate fire watches, the city perfected five liens all of which should be treated as properly included in the tax title account and, as a result, should be included in the redemption amount.  The statute, G. L. c. 148, § 5, provides that when a condition likely to cause fire is present, the local fire department can remediate that condition and charge the property owner for the cost of that remediation.  Before any type of remediation begins, the statute requires that the fire department (1) "make an investigation as to the existence of conditions likely to cause fire;" (2) "in writing, order such conditions to be remedied;" and (3) "serve[] [the order] upon the owner, occupant or his authorized agent by a member of the fire or police department."  G. L. c. 148, § 5.

_____

[10] The fire chief testified that the fire watches were "on and off."  In addition, the fire captain testified that "[t]he fire watch was ongoing and had come on and off at least a few times."

10

"If said order is not complied with within twenty-four hours, the person making such order, or any person designated by him, may enter into such building or upon such premises and remove such refuse or any useable materials or abate such conditions at the expense of such owner or occupant."

Id. Thereafter, the costs of remediation "shall be a debt due the [C]ommonwealth or the city or town, as the case may be, upon completion of such removal or abatement and the rendering of an account therefor to the owner." Id. The collection of such debts is governed by G. L. c. 139, § 3A, which provides that

"[i]f the debt for which such a lien is in effect remains unpaid when the assessors are preparing a real estate tax list and warrant to be committed . . . the town collector of taxes . . . shall certify such debt to the assessors, who shall forthwith add such debt to the tax on the property."

Here, the judge specifically disallowed the charges incurred in the 2011 and early 2012 fire watches due to the city's failure to follow all of the statutory requirements described above. As the judge explained:

"The Court holds LHPNJ failed to prove at trial that, before the Department started the 2011 and the Early 2012 Watches, the Department provided Jefferson 'in writing, [an] order [that unsafe] conditions . . . be remedied,' that notice of such an order was 'served upon [Jefferson] by a member of the fire or police department,' or that the Department entered the Property to begin either of the Watches after Jefferson failed to comply with a properly drafted and properly served abatement order. The summary-judgment and trial record show that the Department served Jefferson with proper c. 148, § 5 orders prior to starting the Late 2012 and Fourth Fire Watches. LHPNJ failed to prove at trial that similar orders issued prior to the 2011 and Early 2012 Watches. LHPNJ thus has not shown that the

11

City perfected its lien for charges relating to the 2011 and Early 2012 Watches."

The judge also disallowed the charges incurred in connection with the fourth watch reasoning that although the fire department had notified Jefferson of its intent to impose a fourth watch, the city "either chose not to send, or neglected to send, Jefferson an accounting for the Fourth Watch once it had ended."  The judge then concluded that by failing to send an accounting, the charges for the fourth watch never became a debt due to the city.

LHPNJ argues that the errors and omissions found by the judge regarding the implementation of the liens for the 2011, early 2012, and fourth watches are not substantial or misleading within the meaning of G. L. c. 60, § 37, and therefore cannot be the basis for invalidating the fire watch charges.  We disagree.

General Laws c. 60, § 37, provides, as relevant here, that

"[n]o tax title and no item included in a tax title account shall be held to be invalid by reason of any error or irregularity which is neither substantial nor misleading, whether such error or irregularity occurs in the proceedings of the collector or the assessors or in the proceedings of any other official or officials charged with duties in connection with the establishment of such tax title or the inclusion of such item in the tax title account."

"Whether an error or irregularity on the part of a collector is substantial or misleading within the meaning of G. L. c. 60, § 37, is a question of fact which must be decided according to

12

the circumstances of each particular case." Pass v. Seekonk, 4 Mass. App. Ct. 447, 450 (1976), citing Fall River v. Conanicut Mills, 294 Mass. 98, 100 (1936). Here, LHPNJ had the burden of proving that the failures noted by the judge were not substantial. See Pass, supra. The judge expressly found that LHPNJ had not met its burden. We discern no error.

The purpose of the provision in G. L. c. 60, § 37, on which LHPNJ relies is to relieve municipalities from the burdens of strict compliance with the tax foreclosure procedures when minor errors are involved. See Boston v. Ditson, 4 Mass. App. Ct. 323, 329 n.6 (1976) (Ditson). As Whittenton notes in its brief, the statute has been applied in cases involving insignificant errors in tax deeds and related materials but has never been applied to cure a municipal officer's failure to take the necessary steps to create a debt at the time it accrued.[11]

_____

[11] See McHale v. Treworgy, 325 Mass. 381, 384 (1950) (erroneous property description was "so substantial and misleading" it rendered tax deed invalid); Quincy v. Wilson, 305 Mass. 229, 232 (1940) (collector's incorrect filing of tax deed led to wrongful inclusion of $1,400 of excessive taxes in taking, an error which "could hardly be found to be 'neither substantial nor misleading'" [citation omitted]); Pass, 4 Mass. App. Ct. at 450-451 (wrong name on tax demand and tax deed rendered deed invalid). Contrast Krueger v. Devine, 18 Mass. App. Ct. 397, 401-402 (1984) (description of land taken for nonpayment of taxes not so vague as to constitute substantial or misleading irregularity); Hilde v. Dixon, 16 Mass. App. Ct. 981, 982 (1983) (no substantial or misleading error when demand was served on deceased person, where administrator of estate was aware of tax bill and demand); Springfield v. Schaffer, 12 Mass.

13

In addition, we are not persuaded by LHPNJ's claim that the city should be excused from its errors because Jefferson was notified of the fire department's intent to implement remediation efforts and was aware of the cost of those efforts, or because the city ultimately recorded the liens at the registry of deeds. As we have previously noted, there is no dispute that Jefferson knew about and agreed to the fire watches, nonetheless, the failures at issue here are not mere formalities. The judge found that the city failed to satisfy the statute's requirements by either failing to provide written notice of the need for remediation (2011 and early 2012 watches) or by failing to provide an accounting (fourth watch). As a result, those charges never became debts due to the city and consequently could not be added to the tax account on the property. Nor do we agree with LHPNJ that because the tax lien foreclosure process has been described as "archaic and arcane" that the city should be excused for its errors. Tallage Lincoln, LLC v. Williams, 485 Mass. 449, 450 (2020). It suffices to note that the city did, in fact, fully comply with the statutory requirements with respect to two of the five fire watches.

---

App. Ct. 277, 279-281 (1981) (tax bill sent to officer and principal stockholder of corporation rather than to corporation did not constitute substantial or misleading error).

14

Lastly, LHPNJ's argument that "public policy/safety concerns require that the fire watch expenses be upheld in full" is not persuasive in the circumstances presented here if only because the city was paid.  LHPNJ, a private for-profit company, purchased the tax title at a public auction and paid the city what it was owed.[12]  Although we understand that LHPNJ did not receive what it thought it was getting, we are hard pressed to conclude that an arm's length deal like the one that occurred here at the tax auction had negative consequences for public safety.

2.  <u>Whittenton's appeal</u>.  Whittenton first challenges the validity of the tax title auction at which LHPNJ became the successor in interest to the city.[13]  Second, Whittenton claims that the judge improperly concluded that, as a mortgagee, it had no due process rights under G. L. c. 148, § 5.  And third, Whittenton faults the judge for not ruling that G. L. c. 148, § 5, is unconstitutional on its face.  We address each argument in turn.

---

[12] See affidavit submitted by Noreen Harrington, a principal of LHPNJ.

[13] The judge denied Whittenton's motion for summary judgment on this ground.  We note, as LHPNJ asserts, that we generally do not review the denial of a motion for summary judgment where, as here, there has been a trial.  However, the trial was limited to two discrete issues and, more importantly, we understand the order of the single justice as permitting Whittenton to appeal from all issues decided in favor of LHPNJ.

15

Contrary to Whittenton's assertion, the judge did not err in concluding that the city's tax auction complied with G. L. c. 60, § 52, which requires, as relevant here, that the city post notice of the public auction of a tax title at least fourteen days in advance through publication in a local newspaper and by posting the notice "in 2 or more convenient and public places in said city or town." It is undisputed that the auction originally was scheduled for April 26, 2017. The city posted public notices of the auction, as required by the statute, and also posted information about the auction on its website. When no registered bidders came forward, the auction was cancelled. Thereafter, the auction was rescheduled for October 25, 2017, and the city posted accurate notices in the Taunton Daily Gazette, the Taunton city hall, and the Taunton public library. However, the city's website was not updated. Whittenton claims that the auction held on October 25, 2017, should be declared null and void because the city's website still referred to the original April date even though that date had passed.

We agree with the conclusion reached by the judge that the auction was valid despite the erroneous information on the city's website. The city not only complied with the statutory requirements regarding the posting of the October date, but, as the judge noted, there was no evidence that the public -- or

16

Whittenton -- was misled.  While the absence of information containing the new date is regrettable, the failure to update the city's website did not render the auction invalid.

Next, Whittenton contends that the judge erred when he ruled (after trial) that because Jefferson had agreed to the imposition of the fire watches, agreed in advance to pay for them, and received two accountings stating the cost of two of the five watches, that Jefferson "waived its right to any additional process that may have been due."  It follows, the judge reasoned, that if Jefferson waived its rights, Whittenton did not have any either.  Whittenton argues that the evidence does not support a conclusion that Jefferson agreed to the fire watches.  It claims that the fire watches were involuntarily imposed, and Jefferson was ordered to pay for them.  According to Whittenton, any interpretation to the contrary rests on erroneous findings of fact.

Put simply, the evidence at trial, and the undisputed facts in the summary judgment record, belie Whittenton's contention.  There is no evidence that Murphy, on behalf of Jefferson, was coerced as Whittenton claims.  It may very well be that given the dire condition of the buildings and the threat they posed to public safety, had Murphy opposed a fire watch one would have been imposed without his consent.  However, that is not the case here.  To the contrary, Murphy testified that he did not object

to the imposition of a fire watch and further acknowledged that he agreed to pay for them.

Lastly, Whittenton claims that the judge erred by not directly addressing the question whether G. L. c. 148, § 5, is constitutional. Whittenton argues that the statue violates the Fourteenth Amendment to the United States Constitution because it does not provide adequate notice to a property owner and has no definitive right of appeal. As an initial matter, we do not believe that the judge was required to reach this issue. The judge, correctly in our view, determined that because Jefferson consented to the fire watches and agreed to pay for them, any due process right to a hearing was waived. Moreover, we agree with the judge that Whittenton's status as the holder of a mortgage did not give rise to an independent right to challenge the constitutionality of G. L. c. 148, § 5. That said, it bears noting that Whittenton (like Jefferson) did, in fact have a statutory right to challenge the imposition and cost of the fire watches at the redemption proceeding, a right of which it has fully (and mostly successfully) availed itself. As the Attorney General observes, Whittenton was given notice of the foreclosure petition and proceeded to answer and object to it. During the ensuing litigation, Whittington not only challenged the cost of the fire watches but prevailed in part by obtaining an order for redemption that reduced the charges significantly.

18

In any event, although we need not reach the issue, we agree with the position advanced by the Attorney General in her amicus brief regarding Whittenton's claim. Over fifty years ago, in Ditson, 4 Mass. App. Ct. at 326-327, we held that the notice provided in the abatement order under the statute was sufficient to survive due process scrutiny. Nothing in the development of our jurisprudence over the past half century persuades us that our holding in Ditson should be modified, let alone overruled.

3. Application of Tyler. The parties dispute the extent to which the United States Supreme Court's recent decision in Tyler bears on the outcome of this case. In Tyler, 598 U.S. at 647-648, the Court held that when a State forecloses on private property to satisfy outstanding tax obligations, any proceeds from the sale of the property in excess of the tax, interest, and collection fees constitute a taking that must be returned to the former owner. As noted, here the judge determined that the takings issue was not ripe and that it should be decided at a later point. We agree. In the circumstances presented we decline to reach the question whether Tyler applies and, if so, to what extent, and remand the case to the Land Court for the judge to consider the issue.

At that time, the judge may also address the applicability of the changes to G. L. c. 60.  See St. 2024, c. 140, §§ 80-99, 250.

> The "Order on Motion for Entry of Finding" is vacated, and the case is remanded for further proceedings consistent with this memorandum and order.
>
> By the Court (Vuono, Meade & Hand, JJ.[14]),
>
> _Paul Little_
>
> Clerk

Entered:  March 4, 2025.

---

[14] The panelists are listed in order of seniority.